2009 Ark. App. 187

**James G. GRANT, Appellant,**

v.

**Betty RICHARDSON, Appellee.**

No. CA 08–556.

Court of Appeals of Arkansas.

March 18, 2009.

500

Mark Rees, Jonesboro, for appellant.

Michael A. Lilly, Jonesboro, for appellee.

LARRY D. VAUGHT, Chief Judge.

Appellant James Grant appeals the trial court's order awarding grandparent visitation to appellee Betty Richardson. James argues on appeal that the order was premature and unsupported by findings and competent evidence. We affirm.

In January 1997, James married Cassie Richardson. They had two children, K.G.

and T.G., born July 24, 1997, and August 17, 2001, respectively. Cassie and James divorced in 2003. The divorce decree provided for joint custody, with Cassie having primary physical custody and James having visitation. James exercised visitation initially, but he discontinued it when he took an out-of-state job.

Cassie's mother, Betty, became concerned about the well being of K.G. and T.G. after Cassie became romantically involved with Larry Matney. Eventually, Betty filed a petition seeking to have herself appointed temporary guardian of K.G. and T.G. Betty ₂alleged, among other things, that Cassie, K.G., and T.G. were living with Larry and that he was abusing them. James consented to the guardianship, and an order granting the temporary-guardianship petition was entered by the trial court in June 2006. In December 2006, James petitioned the court seeking termination of the temporary guardianship and custody of K.G. and T.G. In response, Betty sought permanent guardianship of the children or, in the alternative, grandparent visitation.

At the hearing in December 2007, Betty presented the testimony of two of K.G.'s teachers, who testified that K.G. had shown great academic improvement since being cared for by Betty. The teachers also testified that Betty had consistently signed K.G.'s school agenda book and attended parent-teacher conferences. Betty also presented the testimony of two of her neighbors, who testified that Betty was taking excellent care of K.G. and T.G. and that the children were very happy.

David Richardson, Cassie's father and Betty's ex-husband, testified that Betty had been taking good care of the children. He also testified that Cassie was living with him currently and that he had no objection to Cassie having custody of the children as long as Larry, who "mistreated" Cassie and the children, was not involved.

Cassie testified that she did not want custody of her children but that she did not want her mother, Betty, to have permanent guardianship of them. Instead, she wanted James to have custody of the children. She admitted that when she and James were married, he struck her in the face and broke her jaw. However, she maintained that James had changed since their divorce and that he would be a good father.

₃Much of Betty's testimony explained why she sought temporary guardianship over the children and all she had done to care for the children while she was their guardian. She testified that she did not prevent Cassie and James from exercising visitation; however, she did state that she would not let the children be around Cassie if she was with Larry.

James testified that after the divorce, he regularly visited his children but that his visits stopped when he took a job on a cruise ship. While away, he received calls from Betty concerned about the children living with Larry. James wanted the children out of the abusive situation, and therefore, he consented to Betty's temporary guardianship with the condition that he would seek full custody of the children upon his return.

The trial court issued an order granting James's petition for custody.[1] The trial court also found that Betty was entitled to grandparent visitation pursuant to Arkansas Code Annotated section 9–13–103 (Repl.2008), stating:

> The court finds that Betty Richardson has been the custodian of the children for many months. The Court finds that

---

1. Betty has not appealed this ruling.

she is the person that stepped up and took the children when [James] Grant was off somewhere on the seven seas, and Cassie Grant was living with a wife beater and drunkard.

James appeals the trial court's award of grandparent visitation. Relying upon *Oldham v. Morgan*, 372 Ark. 159, 271 S.W.3d 507 (2008), James first insists that the trial court prematurely awarded grandparent visitation because there was no evidence that Betty had been or would have been denied reasonable visitation with K.G. and T.G. James also argues that the trial court erred in awarding grandparent visitation because there was a lack of findings and competent evidence to support findings that demonstrated that it was in the best interests of the children to have grandparent visitation.

We review domestic-relations cases de novo on the record, and we will not reverse the trial court's findings unless they are clearly erroneous. *Hunter v. Haunert*, 101 Ark.App. 93, 270 S.W.3d 339 (2007). A trial court's finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire record is left with a definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses. *Id.* This deference is even greater in cases involving children, as a heavier burden is placed on the judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

The grandparent statute provides that a grandparent may petition for reasonable visitation rights with her grandchildren if the marital relationship between the parents and the child has been severed by divorce. Ark.Code Ann. § 9–13–103(b)(1).

However, there is a rebuttable presumption that a custodian's decision denying or limiting visitation to a grandparent is in the best interests of the child. Ark.Code Ann. § 9–13–103(c)(1). To rebut the presumption, the grandparent must prove by a preponderance of the evidence that:

(A) The petitioner has established a significant and viable relationship with the child for whom he or she is requesting visitation; and

(B) Visitation with the petitioner is in the best interest of the child.

Ark.Code Ann. § 9–13–103(C)(2)(A), (B).

James, relying upon *Oldham*, urges that the trial court's order awarding grandparent visitation is premature because there was no evidence that Betty had ever been or ever would have been denied reasonable visitation with K.G. and T.G. He argues there must be "some unreasonable denial of the visitation before the grandparent[-]visitation statute can be utilized to force a parent to allow a grandparent to have specific visitation rights."

In *Oldham*, maternal grandparents sought grandparent visitation after their daughter died in a car accident and her ex-husband was awarded full custody of their daughter. The trial court awarded grandparent visitation, holding that the grandparents rebutted the presumption that the child's father's decision denying or limiting visitation was in the best interest of the child. In reversing the trial court's order of visitation, our supreme court held that there was a lack of evidence supporting the finding that the loss of the relationship would result in harm because, among other things, there was "no evidence presented at trial that the relationship between the [grandparents] and [the child] had been or would be lost." *Oldham*, 372 Ark. at 165–66, 271 S.W.3d at 511. The maternal grandmother testified that:

[A]t the moment, [the child's father] is very willing to work with me and let me have [the child] as much as I want her. But I do know that people get remarried and it does affect that relationship. I just want to know that in five years time, if he should remarry, that I have a chance to still see her. It is kind of a safeguard for the future. Right now he has been more than willing to let me have her when I need her and want to see her.

*Oldham,* 372 Ark. at 166, 271 S.W.3d at 511.

*Oldham* is distinguishable from the case at bar. In *Oldham,* there was no evidence to support the finding that grandparent visitation was in the child's best interest because the facts were undisputed that the grandparents had not been unreasonably denied visitation. As stated by the supreme court, there was no evidence that the relationship between the grandparents and their grandchild "had been or would be lost." The parties there were not involved in any type of a custody, guardianship, or visitation dispute concerning the child. Further, the grandmother in *Oldham* testified that she was seeking specified visitation not because she had been denied visitation by the child's father, but to protect her right to see her grandchild in the future.

To the contrary, there is evidence in the instant case supporting a finding that grandparent visitation was in the children's best interests because evidence was presented that demonstrated harm would come to K.G. and T.G. should they discontinue their relationship with Betty. Betty had full custody, via the guardianship, of her grandchildren and has provided one-hundred percent of their care for eighteen months. Further, the facts demonstrate that without court ordered visitation, Betty would likely have been denied reasonable visitation with the children. Betty and James are adversaries in a custody dispute, and there was testimony that they did not like each other. In response to James's testimony that he planned to move the children to Kentucky, Betty stated, "I'm not real confident that if [James] had custody of the kids that I'd get to see them regularly." Thus, unlike *Oldham,* there was evidence that the relationship between the children and Betty "had been or would be lost" and that the children would suffer harm without grandparent visitation. As such, we hold that *Oldham* is distinguishable and that it was not premature for the trial court to award grandparent visitation.

For his second argument, James contends that the trial court erred in awarding grandparent visitation to Betty because there was a lack of findings made and/or competent evidence presented to support findings demonstrating that it was in the best interests of the children to have grandparent visitation. James concedes that the trial court's findings support the statutory requirement that a significant and viable relationship exist between Betty and her grandchildren. As such, to establish grandparent visitation, Betty had to prove that visitation was in the best interests of her grandchildren. Ark.Code Ann. § 9–13–103(c)(2)(B).[2] Be-

---

**2.** Arkansas Code Annotated section 9–13–103(e) provides more detail concerning what is required to establish that visitation with the grandparent is in the best interests of the child:

   (e) To establish that visitation with the petitioner is in the best interest of the child, the petitioner must prove by a preponderance of the evidence the following:

   (1) The petitioner has the capacity to give the child love, affection, and guidance;

   (2) The loss of the relationship between the petitioner and the child is likely to harm the child; and

cause the grandparent-visitation statute is in derogation of or at variance with the common law, it must be strictly construed. *Oldham, supra.*

Although there was no express finding that grandparent visitation was in the children's best interests, James cites to no authority that the lack of such a finding requires reversal. Importantly, when an appeal is reviewed de novo, this means the whole case is open for review. *See Stehle v. Zimmerebner,* 375 Ark. 446, 291 S.W.3d 573 (2009). De novo review does not mean that the findings of fact of the trial court are dismissed out of hand and that the appellate court becomes the surrogate trial judge. *Id.* What it does |₈mean is that a complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred in either making a finding of fact or in failing to do so. *Id.* Therefore, while the trial court in the instant case may have not made express factual findings on the issue of the best interests of the children, when opening the entire case for review, we hold that there was ample evidence presented that could have supported the finding that grandparent visitation was in the best interests of K.G. and T.G. *See Hamilton v. Barrett,* 337 Ark. 460, 466, 989 S.W.2d 520, 523 (1999) (stating that "[w]here the chancellor fails to make findings of fact about a change in circumstances, this court, under its *de novo* review, may nonetheless conclude that there was sufficient evidence from which a chancellor *could* have found a change in circumstances") (emphasis in original).

To prove that grandparent visitation was in the best interests of K.G. and T.G., Betty had to establish, by a preponderance of the evidence, that she had the capacity to give the children love, affection, and guidance, that the loss of the relationship would harm the children, and that Betty was willing to cooperate with James concerning visitation. Ark.Code Ann. § 9–13–103(e)(1)–(3). The testimony of two of K.G.'s teachers, two of Betty's neighbors, Betty's ex-husband, and Betty clearly demonstrated Betty's ability to provide love, affection, and guidance to the children. Based on this evidence and the fact that Betty served as the children's guardian for eighteen months, there is no doubt that harm would come to the children if they are not permitted to maintain their relationship with Betty. Finally, there was testimony presented that when Betty was serving as guardian, she |₉cooperated with James and Cassie concerning their visitation. This evidence supports the conclusion that she would fully cooperate with James for grandparent visitation. Accordingly, under our de novo review, we hold that the trial court did not clearly err in entering an order awarding grandparent visitation.

Affirmed.

HART and BROWN, JJ., agree.

---

(3) The petitioner is willing to cooperate with the custodian if visitation with the child is allowed.